IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| DAVID N. LAMBETH, D/B/A LAMBETH SYSTEMS (A SOLE PROPRIETORSHIP), | ) ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | |
| | ) | Civil Action No. _____ |
| ACACIA RESEARCH CORPORATION; | ) | |
| SBS MAGNETICS LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| DEFENDANTS. | ) | |

## ORIGINAL COMPLAINT

Plaintiff David N. Lambeth, d/b/a/ Lambeth Systems ("Lambeth"), files this Original Complaint against Defendants Acacia Research Corporation ("Acacia") and SBS Magnetics LLC ("SBS") as follows:

## NATURE OF THE ACTION

1.      Acacia's core business is to acquire patent rights from inventors and subsequently license those patent rights to corporate users that may be infringing on the patents or pursue infringement claims against them. Acacia claims to offer inventors access to new markets and major companies, an expertise of the industry, and provides deep pockets if and when litigation ensues. To facilitate its business plan, Acacia forms shell subsidiaries, such as SBS, that ultimately enter into the transactions with the inventors after Acacia negotiates the salient points.

2.      This suit arises out of such a transaction. Acacia, through its subsidiary, SBS, "partnered" with Lambeth to monetize Lambeth's portfolio of patents related to magnetic recording used in, among other things, hard disk drives. Given that hard disk drives ("HDD") comprise a multi-billion dollar market and that the preliminary analysis indicated that most

major companies in the HDD market were infringing on Lambeth's patents, the arrangement between Acacia and Lambeth had the potential to be very fruitful. But, things quickly deteriorated as Acacia blatantly disregarded its obligations to its inventor partner by strategically breaching its contractual duties to Lambeth and intentionally misleading him in order to stuff its own pockets at his expense.

3.      Lambeth assigned his patent rights ("Lambeth's Patents") to Acacia/SBS[1] in exchange for a flat fee and royalty rights, pursuant to an agreement dated December 18, 2010 (the "12/18/10 Agreement"). The 12/18/10 Agreement contained an express contractual obligation that Acacia/SBS absolutely would not bundle Lambeth's Patents with any other patent(s) in Acacia's enormous portfolio in a patent litigation or license agreement. The clear purpose of this provision was to avoid an allocation fight with Acacia/SBS regarding the resulting value of Lambeth's Patents in relation to patents invented by others. Acacia advised Lambeth that its CEO personally was aware of and approved this provision before the 12/18/10 Agreement was finalized.

4.      Nonetheless, Acacia/SBS promptly broke this promise by bundling Lambeth's Patents with a slew of other patents to obtain a massive settlement and further allocating an improperly small share of the proceeds to Lambeth's Patents, resulting in an enormous benefit to Acaica and detriment to Lambeth. Compounding its violation of this express provision, Acacia/SBS not only has refused to pay Lambeth full compensation owed to him for royalties, but also has improperly withheld taxes from Lambeth and failed to pay him for the consulting services contracted for and ultimately utilized to solidify the massive settlement.

---

[1]      Throughout the Original Complaint, Lambeth uses the term "Acacia/SBS" because of the tremendous overlap and joint participation of these two entities. When Plaintiff only uses the term Acacia or SBS, Plaintiff is by no means limiting itself to one or the other or otherwise stating that Acacia and SBS did not act in joint concert with respect to that particular event.

## PARTIES

5.  David N. Lambeth is a citizen of Pennsylvania resident at 118 Buckingham Road, Pittsburgh, PA 15215. He does business as Lambeth Systems, a sole proprietorship owned and operated by David N. Lambeth, with a principal place of business at the same address.

6.  Acacia Research Corporation is a Delaware corporation having a principal place of business at 500 Newport Beach Center Drive, 7th Floor, Newport Beach, CA 92660. Acacia Research Corporation in publicly traded on the NASDAQ stock index as ACTG. Acacia Research Corporation may be served with process through its registered agent, Paul R. Ryan, 500 Newport Beach Center Drive, 7th Floor, Newport Beach, CA 92660.

7.  SBS Magnetics LLC is a Texas limited liability company having a principal place of business at 6136 Frisco Square Boulevard, Suite 385, Frisco, TX 75034. SBS Magnetics LLC is a wholly owned subsidiary of Acacia Research Group LLC. SBS Magnetics LLC may be served with process through its registered agent, Registered Agent Solutions, Inc., 1701 Directors Blvd., Suite 300, Austin, TX 78744.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties are of diverse citizenship, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

9.  The 12/18/10 Agreement, Section 7.1, provides in part:

> SBS and LS each irrevocably consent to the exclusive jurisdiction of any Texas state or federal court sitting in the Eastern District of Texas, over any suit, action, or proceeding arising out of or relating to this Agreement...

10. This Court has personal jurisdiction over SBS as SBS purports to reside in Texas and is a Texas limited liability corporation.

11.     This Court has personal jurisdiction over Acacia as, upon information and belief, Acacia has in fact transacted business in Texas, and has maintained a substantial presence in Texas.

12.     Venue in this Court is proper under 28 U.S.C. § 1391(a) and (c).

## FACTUAL BACKGROUND

### A.     The Relationship Between Lambeth and Acacia/SBS.

13.     In or about 1999, Lambeth performed consulting work for Discovision Associates ("DVA"). During that time, Lambeth interacted with Victor Shubert and Craig Burnett.

14.     In approximately 2007, Lambeth decided to try and license the Lambeth Patents. He initially contacted Mr. Shubert, who directed him to Acacia where Craig Burnett was currently employed. Lambeth was then put in contact with Dooyong Lee at Acacia, Newport Beach, CA, where, Lambeth met Phil Mitchell and Dooyong Lee. From there, Lambeth's relationship with Acacia grew and he ultimately met and interacted with Steve Wong.

15.     Lambeth spent many hours over the next few years, and especially during the 2008 – 2010 time period, discussing a variety of items with Mr. Mitchell, Mr. Wong and Mr. Lee related to the Lambeth Patents and potential infringers. Indeed, Mr. Mitchell and Lambeth became personal friends as the relationship between Acacia and Lambeth developed, and it was ultimately Mr. Mitchell and Mr. Wong that helped persuade Lambeth to enter into the 12/18/10 Agreement with Acacia/SBS. Mr. Mitchell and Mr. Wong used their "friendship" with Lambeth to secure Lambeth's trust and confidence.

### B.     Lambeth Assigns the Lambeth Patents to Acacia/SBS.

16.     Lambeth is the named inventor on and former owner of U.S. Patent No. 7,128,988, titled Magnetic Material Structures, Devices and Methods ("the '988 patent").

17.     Lambeth also is the named inventor on and former owner of the related foreign counterpart patents granted in Singapore, Korea, Japan, and pending in the European Union (collectively, the '988 patent and the foreign counterparts are being referred to as the "Lambeth Patents").

18.     On or around December 22, 2010, Lambeth and Acacia/SBS executed the 12/18/10 Agreement. A true and correct copy of the 12/18/10 Agreement is attached hereto as "**Exhibit A**" and fully incorporated herein by reference.

19.     Pursuant to the 12/18/10 Agreement, Lambeth assigned certain rights, title and interest in the Lambeth Patents in exchange for a non-refundable up front cash payment, a number of milestone payments, and 35% royalties on the total gross licensing proceeds of the Lambeth Patents. *See* Exhibit A.

20.     Given the enormous number of other patents owned by Acacia and its shell subsidiaries, the likelihood that Acacia/SBS would face conflicts of interest if it were necessary to allocate the proceeds of licensing arrangement among its other partners or Acacia owned patents and the inherent difficulties in valuing all included portfolios, Lambeth wanted to prevent Acacia from bundling the Lambeth Patents with other patents as part of licensing or litigation.

21.     Accordingly, Lambeth insisted that the 12/18/10 Agreement specifically restrict the Defendants' ability to package the Lambeth Patents with other patents in any patent litigation or licensing arrangement. Lambeth's position (and Acacia's/SBS' agreement with it) ultimately was memorialized in Section 3.4 of the 12/18/10 Agreement, which states:

> SBS shall not, directly or indirectly through its Affiliates or any third party, litigate or license the Patents in combination with any other patent against any infringing party.

22.     Prior to execution of the 12/18/10 Agreement, representatives of Acacia indicated that Acacia's CEO had approved Lambeth's requirement that the Lambeth Patents would not be bundled with any other patents in any patent litigation or licensing agreement.

23.     One reason for including section 3.4 in the 12/18/10 Agreement was to prevent Acacia/SBS from including the Lambeth Patents as part of a larger patent portfolio in any potential patent litigation settlement or license, with Acacia/SBS then having discretion to allocate the proceeds of such an agreement in a manner that undervalues the Lambeth Patents and/or overvalues patents owned by Acacia, its subsidiaries, or its other partners.

C.     **Acacia Creates SBS as a Vehicle to Hold the Lambeth Patents**

24.     Acacia organizes and operates its subsidiaries, including SBS, as mere tools and business conduits to facilitate its own objectives of pursuing claims while maintaining a cloak of secrecy. As such, SBS is an alter ego of Acacia.

25.     For example, Acacia's officers and/or employees negotiated all of the terms of the 12/18/10 Agreement with Lambeth. Communications between the parties were all done by Acacia employees with Acacia phone numbers and Acacia email addresses. Term sheets and preliminary drafts of the 12/18/10 Agreement were dated as late as December 2, 2010, which was only weeks before the 12/18/2010 Agreement was signed.

26.     SBS did not exist until December 7, 2010, by which point the parties had agreed on the material terms of the 12/18/10 Agreement. SBS has the exact same address as Acacia with respect to Acacia's Frisco, Texas office. SBS and Acacia share employees, assets, property, and resources. In fact, SBS had no known employees who were not employees of Acacia.

27.     And, upon information and belief, SBS was created for the sole and limited purpose of owning the Lambeth Patents and owns only the Lambeth Patents. Further, upon

information and belief, SBS is not sufficiently capitalized to operate on its own without the assistance of Acacia.

28.    Acacia regularly conducts its business of patent litigation and patent licensing by treating the patent portfolios held by its subsidiaries as its own, and it did so in connection with the Lambeth Patents.

29.    In fact, Acacia, not SBS, made the decisions to license the Lambeth Patents in a manner that violated the 12/18/10 Agreement. Furthermore, officers of Acacia made the decisions that resulted in the breaches described below.

30.    Therefore, despite the purportedly separate legal identities of SBS and Acacia, it is equitable and proper for the Court to overlook these legal fictions and hold Acacia accountable for the conduct described below.

**D.    Acacia/SBS Manifests its Assent to a Consulting Agreement with Lambeth.**

31.    In the 12/18/10 Agreement, the parties recognized that Lambeth would assist in performing, among other things, critical research and analysis in relation to magnetics and magnetic thin films in order to facilitate Acacia's attempt to identify potential infringers of the Lambeth Patents (the "Consulting Agreement"). When Acacia/SBS failed to provide a document for Lambeth to sign, he requested a draft agreement, which was provided. Lambeth revised the draft to accurately reflect the parties' agreement and returned a signed copy to Acacia on January 11, 2011. A true and correct copy of the signed Consulting Agreement is attached as "**Exhibit B**" and fully incorporated by reference.

32.    Before and after receiving the Consulting Agreement, Acacia/SBS made numerous requests that Lambeth proceed with work pursuant to it, although it did not return an executed copy. In reliance upon the terms, including those set forth in the Consulting

Agreement, and the representations that had been made by Acacia/SBS, Lambeth performed work pursuant to the Consulting Agreement between January and March 2011.[2]

E.    **Acacia/SBS Bundles and Undervalues the Lambeth Patents**

33.    In late 2010, Acacia/SBS began asserting increased pressure on Lambeth to provide data for a claims chart against Samsung, which is an internal analysis of claims that Acacia could assert against Samsung for infringement of the Lambeth Patents. At the same time, Acacia/SBS was directing Lambeth to create a paper detailing the science behind the Lambeth Patents. On information and belief, Acacia/SBS intended to show the paper to Samsung's engineers in order to bolster the value of the Lambeth Patents.

34.    On or about March 7, 2011, using the work Lambeth performed under the Consulting Agreement, Acacia/SBS, acting through another of its subsidiaries, Smartphone Technologies, LLC, entered into an agreement with Samsung whereby the Lambeth Patents and other patents related to smart phones would be licensed to Samsung (the "Samsung Agreement"). Acacia/SBS announced the Samsung Agreement in a press release later that day. A true and correct copy of the press release is attached as "**Exhibit C**" and fully incorporated herein by reference.

35.    The Samsung Agreement was part of a global settlement between Acacia/SBS and Samsung that occurred on or about March 4, 2011, pursuant to which Samsung paid Acacia/SBS $45 million, minus $7.425 million in taxes withheld pursuant to the United States – Republic of Korea Income Tax Convention.

---

[2]    Specifically, at Acacia's direction, Lambeth also helped purchase certain special equipment that would help determine whether other companies infringed the Lambeth Patents. Acacia has failed to compensate Lambeth for these expenses, which are included in this Complaint.

36. Notwithstanding the clear contractual prohibition that the Acacia/SBS and Lambeth had negotiated, Acacia/SBS informed Lambeth that it licensed the Lambeth Patents, along with a large number of other patents, to Samsung.

37. Acacia's Corporate Code of Conduct requires its "officers, directors and employees [to] act at all times in an honest and ethical manner in connection with their service to Acacia" and emphasizes that the "principles of integrity, accountability and fair dealing are the cornerstone of Acacia's business, and are critical to its future success."

38. Nonetheless, Acacia/SBS intentionally bundled the Lambeth Patents with the other patents assigned to Samsung, which clearly violates the anti-bundling provision of the 12/18/10 Agreement. Acacia's/SBS' conduct not only violated the 12/18/10 Agreement, but it ran completely afoul of its corporate code which should have prevented Acacia/SBS from sacrificing its obligations to its "partner" Lambeth for the benefit of other interests at Acacia.

39. At or about the time that it executed the Samsung Agreement, Acacia/SBS informed Lambeth as to the amount of the Samsung payment that it had unilaterally allocated to the Lambeth Patents. This allocation was completely one-sided and intended to benefit Acacia/SBS to Lambeth's detriment.

**F.  Acacia/SBS Misleads Lambeth About the Valuation of the Lambeth Patents.**

40. Subsequently, Acacia/SBS informed Lambeth as to the amount of the Samsung payment that it had unilaterally allocated to the Lambeth Patents. Acacia's/SBS' allocation was completely one-sided and intended to benefit Acacia/SBS to Lambeth's detriment.

41. The 12/18/10 Agreement prohibits baseless allocations of value. Specifically, it (i) requires Acacia/SBS to "keep complete and proper records of the Total Recoveries;" (ii) provides Lambeth the right to "examine SBS' records pertinent to this Agreement;" and (iii) entitles Lambeth to "the details of the calculation of litigation and licensing proceeds

recovered (including where applicable, the royalty base, the number of units sold, and the basis for any lump sum payments made by each licensee), the amount recovered from each licensee and the calculation and distribution of Total Recoveries." *See* Exhibit A, at ¶¶ 4.1–4.3.

42.     Likewise, Acacia's Corporate Code of Conduct also requires that transactions "be completely and accurately recorded on Acacia's books and records in accordance with generally accepted accounting practices and established Acacia financial policy."

43.     Records pertinent to Acacia's/SBS' unilateral allocation of the $45 million Samsung payment include, but are not limited to, Acacia's/SBS' agreements with its other "partners" whose portfolios were licensed to Samsung, documents and presentations reflecting the negotiation of the Samsung agreement, documents reflecting when and how the allocations of all proceeds of the Samsung agreement were made and documents reflecting any internal or external valuations of all of the patents licensed to Samsung.

44.     Acacia/SBS, however, has refused to provide to Lambeth all of the records pertinent to the 12/18/10 Agreement or the calculation of his share of the $45 million Samsung payment.

45.     Despite Lambeth's demands for documents supporting Acacia's/SBS' unilateral allocation of the proceeds of the Samsung transaction, Acacia/SBS provided only oral assurances that the allocation was appropriate and, on an "attorneys' eyes only" basis, a heavily redacted and incomplete copy of the Samsung Agreement.

46.     The reality is that Acacia/SBS seriously undervalued the Lambeth Patents on its own merits and in relation to the value of the other patents that are the subject of the Samsung agreement.

**G.     Acacia/SBS Improperly Withholds Taxes from Lambeth and Claims Those Very Same Taxes as Deductions for Itself**

47.     Section 2.6 of the 12/18/10 Agreement also provides, in relevant part, that:

All Taxes … shall be the financial responsibility of the Party obligated to pay
such Taxes as determined by the applicable law and neither Party is or shall be
liable at any time for any of the other Party's Taxes incurred in connection with
or related to amounts paid or recovered under this Agreement.

48.     Lambeth himself transacted no business with Samsung or otherwise conducted
business with Korea.  Lambeth owes no taxes to Korea as the result of Acacia's transaction with
Samsung.

49.     Acacia/SBS, on the other hand, transacted business with Samsung and,
accordingly, owed taxes to Korea.

50.     As a result of the Samsung transaction, Acacia recognized $45 million in revenue
on the financial statements it filed as part of its Form 10-Q for the quarter ended March 31, 2011.

51.     Also in its Form 10-Q for the quarter ended March 31, 2011, Acacia indicated that
its own effective tax rate had increased as a result of a 16.5% Korean foreign withholding tax
withheld pursuant to the requirements of the United States – Republic of Korea Income Tax
Convention imposed on the proceeds of the Samsung transaction and that such withholding
could be claimed as a deduction or credit on Acacia's future United States tax liabilities.

52.     Accordingly, Acacia treated the revenue from the Samsung transaction and the
resulting Korean withholding tax as its own on its books and records.

53.     Acacia/SBS, however, withheld 16.5% of Lambeth's designated share of the
Samsung proceeds from the gross amount it attributed to the Lambeth Patents and calculated
Lambeth's 35% royalty share.  Acacia/SBS asserted that it was withholding this amount to
satisfy Lambeth's purported Korean tax obligations.

54.     By withholding the Korean taxes from its payment to Lambeth, Acacia/SBS is improperly attempting to shift its tax obligations to him, while benefitting from a deduction or credit on Acacia's United States tax liabilities.

55.     Acacia's/SBS' withholding violates Sections 2.6 and 2.7 of the 12/18/10 Agreement and is inconsistent with its own tax returns and its statements in its public filings with the Securities and Exchange Commission ("SEC").

56.     Records pertinent to Acacia's/SBS' withholding of Korean taxes from Lambeth's payment include communications with Samsung on the subject, Acacia's tax returns, its internal financial statements, and SEC filings and documents reflecting whether it withheld such payments from its other "partners" whose portfolios were licensed to Samsung.

57.     Despite receiving notice from Lambeth to remit the improperly withheld amounts, Acacia/SBS has refused, in bad faith, to comply.

**H.     Acacia/SBS Breach the Consulting Agreement After Lambeth Has Performed.**

58.     After the dispute over the foregoing issues arose, Acacia/SBS disavowed the Consulting Agreement, claiming that it never agreed to the changes Lambeth proposed in January 11, 2011, even though Acacia/SBS repeatedly asked Lambeth to perform services under the Consulting Agreement, which Lambeth did. Acacia/SBS refused to pay Lambeth for some of the work he performed or the entirety of the minimum payments due under the Consulting Agreement.

**I.     Notice and Satisfaction of Conditions Precedent**

59.     Lambeth provided Acacia/SBS with formal notice of the defaults of the 12/18/10 Agreement in a letter on September 27, 2011, a true and correct copy of which is attached as

"**Exhibit D**." Acacia/SBS refused to cure the defaults identified in the September 27, 2011 letter.

60.     Accordingly, by letter dated March 1, 2013, Lambeth is terminating the 12/18/10 Agreement pursuant to Section 6.2 thereof and demanding the immediate return of the Lambeth Patents.

61.     Lambeth otherwise performed under the 12/18/10 Agreement and the Consulting Agreement and all other conditions precedent have been met, waived or excused.

## COUNT I – BREACH OF THE 12/18/10 AGREEMENT

62.     Lambeth incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

63.     The 12/18/10 Agreement is a valid contract binding upon SBS and Acacia.

64.     Lambeth has performed all of his obligations under the 12/18/10 Agreement.

65.     Acacia/SBS breached the 12/18/10 Agreement by, among other things: (i) bundling the rights to use the Lambeth Patents along with the rights to use other patents; (ii) undervaluing the Lambeth Patents and therefore underpaying Lambeth for his rightful share of the proceeds of the Samsung transaction; (iii) improperly withholding the Korean taxes from the payments to Lambeth; and (iv) refusing to provide all of the pertinent documentation supporting its positions on the foregoing.

66.     As a direct and proximate result of Acacia's/SBS' actions, Lambeth has been damaged by the foregoing breaches of the 12/18/10 Agreement, for which he now sues.

67.     Furthermore, under Section 6.2 of the 12/18/10 Agreement, Lambeth is entitled to the return of the Lambeth Patents because Acacia/SBS were notified of the defaults identified above, but refused in bad faith to cure those defaults.

## COUNT II – BREACH OF THE CONSULTING AGREEMENT

68.     Lambeth incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

69.     Acacia/SBS manifested its assent to the Consulting Agreement by requesting Lambeth to do consulting work after it had received Lambeth's signed copy of the Consulting Agreement.

70.     Consequently, the Consulting Agreement is a binding contract between Lambeth and Acacia/SBS.

71.     Furthermore, Lambeth performed his obligations under the Consulting Agreement consistent with the request of Acacia/SBS and prior to any complaints about the validity of the Consulting Agreement by Acacia/SBS.  Acacia/SBS not only directed Lambeth's consulting efforts but actually paid portions of the monies due under the Consulting Agreement indicating acceptance of the Consulting Agreement.

72.     Acacia/SBS breached the Consulting Agreement by refusing to compensate Lambeth for the minimum amounts due thereunder, including, but not limited to, the consulting fees and reimbursements of expenses.

73.     As a direct and proximate result of Acacia's/SBS' actions, Lambeth has been damaged by the foregoing breach of the Consulting Agreement, for which he now sues.

## COUNT III – BREACH OF FIDUCIARY DUTY

74.     Lambeth incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

75.     The business relationship between Lambeth and Acacia/SBS is one where each party must repose trust and confidence in the other in order to prevent unauthorized use of the

inventions claimed in the Lambeth Patents and to generate revenue from licensing and enforcing the Lambeth Patents.

76.  Indeed, Acacia holds itself out as a "partner" with inventors such as Lambeth.

77.  Acacia's website is replete with testimonials and advertisements stating that Acacia forms partnerships with its inventors to achieve mutually beneficial and fair results. Indeed, one such testimonial goes on to state that Acacia provides "the tools [] need[ed] to be able to deal with these large companies and receive fair treatment for [] patents." Another exemplifies Acacia's allure to inventors: "Acacia is a true partner leveraging its technology awareness and industry recognition as a formidable and fair champion for and on behalf of patent owners."

78.  It was Acacia's industry knowledge, meaningful contacts, deep pockets, and promise for fair treatment that encouraged Lambeth to "partner" with Acacia/SBS in the first place.

79.  The relationship between some of Acacia's employees and Lambeth began prior to and apart from the duties and responsibilities described in the 12/18/10 Agreement.

80.  As such, Acacia/SBS has a fiduciary duty toward Lambeth to act in the utmost good faith and fairness, and to not take selfish advantage of Lambeth's trust.

81.  The decision whether to settle a patent infringement claim that involves numerous patents in a manner that would give rise to proceeds that must be allocated to itself and various "partners" with different royalty agreements creates a conflict of interest for Acacia/SBS and its counsel.

82.  Acacia/SBS has breached its fiduciary duties toward Lambeth by: (i) including the Lambeth Patents in the group of patents licensed to Samsung in a manner that was contrary

to Lambeth's express instruction and was for the purpose of benefitting other Acacia partners and/or internal interests; (ii) refusing to disclose fully to Lambeth the nature and details of the Samsung settlement and other pertinent information, and thus preventing Lambeth from ascertaining how Acacia/SBS allocated the proceeds of the Samsung transaction; (iii) improperly withholding a 16.5% Korean tax from the royalties it did pay to Lambeth such that Acacia/SBS shifted its own tax liabilities to Lambeth; (iv) and failing to properly allocate value to the Lambeth Patents.

83.     As a direct and proximate result of Acacia's/SBS' actions, Lambeth has been damaged by the foregoing breaches of fiduciary duty, for which he now sues.

### COUNT IV – BREACH OF SPECIAL OR CONFIDENTIAL RELATIONSHIP

84.     Lambeth incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

85.     The business relationship between Lambeth and Acacia/SBS is one where each party must repose trust and confidence in the other in order to prevent unauthorized use of the inventions claimed in the Lambeth Patents and to generate revenue from licensing and enforcing the Lambeth Patents.

86.     Separate and apart from the parties' business relationship, either under the 12/18/10 Agreement or otherwise, Lambeth and Acacia had a relationship of trust and confidence, such that Lambeth relied on and trusted Acacia/SBS to treat Lambeth fairly and act in the best interest of their "partnership."

87.     Acacia held itself out as a "partner" with inventors such as Lambeth, and Lambeth relied on Acacia/SBS inasmuch as Acacia is a sophisticated market participant, has meaningful industry contracts, significant resources, and a wealth of industry knowledge.

88.     Indeed, Acacia's website is replete with testimonials and advertisements stating that Acacia forms partnerships with its inventors to achieve mutually beneficial and fair results. Indeed, one such testimonial goes on to state that Acacia provides "the tools [] need[ed] to be able to deal with these large companies and receive fair treatment for [] patents." Another exemplifies Acacia's allure to inventors: "Acacia is a true partner leveraging its technology awareness and industry recognition as a formidable and fair champion for and on behalf of patent owners."

89.     Acacia/SBS has breached its duties toward Lambeth by: (i) including the Lambeth Patents in the group of patents licensed to Samsung in a manner that was contrary to Lambeth's express instruction and was for the purpose of benefitting other Acacia partners and/or internal interests; (ii) refusing to disclose fully to Lambeth the nature and details of the Samsung settlement and other pertinent information, and thus preventing Lambeth from ascertaining how Acacia/SBS allocated the proceeds of the Samsung transaction; (iii) improperly withholding a 16.5% Korean tax from the royalties it did pay to Lambeth such that Acacia/SBS shifted its own tax liabilities to Lambeth; (iv) and failing to properly allocate value to the Lambeth Patents.

90.     As a direct and proximate result of Acacia's/SBS' actions, Lambeth has been damaged by the foregoing breaches of Acacia's/SBS' special and/or confidential relationship, for which he now sues.

## COUNT V – TORTIOUS INTERFERENCE

91.     Lambeth incorporates by reference, as if fully set forth herein, each and every one of the foregoing numbered paragraphs.

92.     Lambeth had valid contracts with SBS.

93.     Acacia willfully and intentionally interfered with the 12/18/10 Agreement in order to consummate the assignment to Samsung in a manner that was beneficial to Acacia and detrimental to Lambeth and in violation of the express terms of the contract.

94.     Acacia willfully and intentionally interfered with the Consulting Agreement by withholding funds from Lambeth, either directly or indirectly, even though Acacia encouraged and mislead Lambeth to perform services under the contract.

95.     As a direct and proximate result of Acacia's actions, Lambeth has been damaged by the foregoing tortious interferences with Lambeth's contracts, for which he now sues.

## RELIEF REQUESTED

WHEREFORE, Lambeth respectfully requests that this Court enter judgment against Acacia and SBS in accordance with the relief requested above and award Lambeth: (1) his actual and compensatory damages for all the breaches that have occurred; (2) pre-judgment and post-judgment interest at the maximum rate allowed by law; (3) ownership of the Lambeth Patents and all rights and benefits of it; (4) punitive damages for the actions undertaken by Acacia/SBS; (5) his costs and attorneys' fees; and (6) such other relief that this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Lambeth hereby demands a trial by jury on all issues triable of right by a jury.

Dated: March 1, 2013

Respectfully submitted,

*/s/ John R. Hardin*
John R. Hardin, *Lead Attorney*
State Bar No. 24012784
john.hardin@klgates.com
Artoush Varshosaz
State Bar No. 24066234
artoush.varshosaz@klgates.com

**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone: (214) 939-5500
Facsimile: (214) 939-5849

**ATTORNEYS FOR PLAINTIFF**
**DAVID N. LAMBETH D/B/A**
**LAMBETH SYSTEMS**



EXHIBIT A



**Clerk's Note: Exhibit A (19 pages) has been removed per the Court's Opinion & Order [Dkt. # 47]**

# EXHIBIT B

## CONSULTING AGREEMENT

This **CONSULTING AGREEMENT** (the "**Agreement**") is entered into by and between **SBS MAGNETICS LLC** ("**COMPANY**"), a Texas limited liability company, having a place of business located at 6136 Frisco Square Blvd. Suite 385, Frisco, TX 75034 and **LAMBETH SYSTEMS** ("**CONSULTANT**") having an address at 118 Buckingham Road, Pittsburgh, PA 15215. The effective date of this Agreement shall be December 18, 2011.

The parties hereby agree as follows:

### 1. INDEPENDENT CONSULTANT STATUS.

1.1. Status. CONSULTANT desires to perform the services (the "**Services**") described in Schedule A (Description of Services) of this Agreement and such other services requested orally or in writing by COMPANY and agreed upon by CONSULTANT in CONSULTANT's sole discretion (collectively, the "**Services**") that shall be documented in the form and format of Schedule A and subsequently incorporated by this reference into this Agreement. CONSULTANT will act solely as an independent contractor and neither CONSULTANT nor his employees or agents shall be considered an employee, agent or partner of COMPANY under the provisions of this Agreement or otherwise.

1.2. COMPANY guarantees CONSULTANT at least five hundred (500) hours of requested Services per year for each of calendar years 2011 and 2012. The parties agree that CONSULTANT shall not be obligated to agree to or accept all requests for Services.

### 2. CONSULTANT'S SERVICES.

2.1. Services. CONSULTANT's engagement and the Services have been requested by counsel, Steve Wong, in anticipation of potential litigation. CONSULTANT's Work Product (as defined in Section 5-Proprietary Rights, herein) will be used by COMPANY's litigation counsel in evaluating potential litigation and, if filed, in the conduct of that litigation. All Work Product arising from the Services and thought processes specific to the performance of the Services are subject to the confidentiality obligations set forth in Section 6 below. CONSULTANT shall perform the Services in good faith and shall in good faith avoid any conflicts of interest in the performance of his obligations under this Agreement.

### 3. COMPENSATION.

3.1. Payments. As full compensation for the Services, and any Work Product, COMPANY shall pay to CONSULTANT the amount(s) specified in Schedule B (Payment Schedule) to this Agreement. Such payments shall be made Net 30 days after receipt of an invoice.

3.2. Expenses. COMPANY shall reimburse CONSULTANT for his reasonable out-of-pocket expenses including pre-approved equipment rental and supplies used in performing the Services, pre-approved travel (including without limitation reasonable expenses for lodging, meals, gratuities, and cab, rental car or parking fees, incident to any required overnight travel), telephone, facsimile, and overnight courier charges. CONSULTANT shall provide COMPANY with receipts for such expenses.

3.3. Authority. CONSULTANT does not have and shall not have any authority, and CONSULTANT shall not represent that CONSULTANT has the authority, to bind COMPANY, to assume or to create any obligation or responsibility, express or implied, on behalf of COMPANY or in its name.

3.4. Other Compensation. CONSULTANT shall not be entitled to any remuneration, benefits, or expenses other than as specifically provided for in this Agreement or provided for in other separate formal agreements or contracts.

## 4. TAXES.

4.1. CONSULTANT acknowledges and agrees that it is the sole responsibility of CONSULTANT to report as income his compensation received from COMPANY and to make the requisite tax filings and payments to the appropriate federal, state or local tax authority. No part of CONSULTANT's compensation shall be subject to withholding by COMPANY for the payment of social security, unemployment, or disability insurance or any other similar state or federal tax obligations.

## 5. PROPRIETARY RIGHTS.

5.1. Ownership. All intellectual property rights, including without limitation all copyrights, trademarks, patents, trade secret rights, moral rights and all contract and licensing rights related to all ideas, inventions, designs, improvements, and discoveries developed by CONSULTANT prior to the Effective Date of this Agreement or developed by CONSULTANT outside the scope of this Agreement shall be owned by the CONSULTANT. All intellectual property rights, including without limitation all copyrights, trademarks, patents, trade secret rights, moral rights and all contract and licensing rights related to all ideas, inventions, designs, improvements, and discoveries individually developed by CONSULTANT and resulting directly from the work performed hereunder directly and exclusively related to the Services (collectively, the "Work Product"), shall be the sole and exclusive property of COMPANY. CONSULTANT agrees that all files, records, documents, drawings, specifications, equipment and other documentation arising from performance of the Services, whether prepared by CONSULTANT or otherwise coming into CONSULTANT's possession, shall remain the exclusive property of COMPANY. CONSULTANT acknowledges that COMPANY's rights to the Work Product are exclusive to COMPANY and include, but are not limited to, the right to use, adapt, reproduce, distribute, broadcast, display and make derivative works of the Work Product in any and all media and all formats now known or later developed. Company acknowledges that COMPANY's rights to the Work Product do not include the right to alter or distort the factual data or results obtained. Work Product as used herein shall also include the data and results obtained from the Services performed under this Agreement. The COMPANY acknowledges that CONSULTANT performs similar services for others including Carnegie Mellon University and other companies and that those works, ideas, inventions, designs, improvements, and discoveries developed by Consultant are not part of the Work Product.

5.2. Work Made For Hire. Without limiting the foregoing, CONSULTANT hereby acknowledges that any Work Product to be delivered to COMPANY in conjunction with the Services performed under this Agreement is work made for hire and COMPANY shall be considered the author of such work made for hire and own all right, title and interest therein.

5.3. Assignment. To the extent that the Work Product does not constitute a work made for hire, CONSULTANT hereby irrevocably grants, assigns and transfers to COMPANY all right, title and interest in and to the Work Product. COMPANY shall have the sole and exclusive worldwide right, title and interest in perpetuity to use and exploit all or any part of the Work Product.

5.4. Waiver/License. In the event CONSULTANT has any rights to the Work Product that cannot be assigned to the COMPANY, CONSULTANT hereby unconditionally and irrevocably waives the enforcement of all such rights and all claims of any kind with respect to such rights against COMPANY and COMPANY's successors, distributors and customers. In the event CONSULTANT has rights to the Work Product that cannot be assigned or waived, CONSULTANT hereby grants to COMPANY and its successors, an exclusive, worldwide, perpetual, royalty-free license to use the Work Product in any way whatsoever and to sublicense and assign those rights as COMPANY chooses.

5.5. Additional Documents. CONSULTANT agrees to execute any documents as COMPANY may request to evidence or otherwise protect COMPANY's ownership, assignment or license of the Work Product. CONSULTANT appoints COMPANY as CONSULTANT's attorney-in-fact to execute any such documents on CONSULTANT's behalf if CONSULTANT fails to do so within ten (10) business days of COMPANY' reasonable request.

5.6. Disclosure. CONSULTANT agrees to promptly and fully inform and disclose to COMPANY all Work Product produced by or on behalf of CONSULTANT during the term of this Agreement.

## 6. CONFIDENTIAL INFORMATION.

6.1. Definition. By virtue of this Agreement, CONSULTANT may have access to information that is confidential ("**Confidential Information**"). Confidential Information includes, without limitation: (i) any and all trade secrets; (ii) technical information concerning the COMPANY products and intellectual property, including data and specifications, diagrams, flow charts, drawings, test results, know-how, processes, inventions, research projects and product development; (iii) information concerning the COMPANY business, including royalty rates, profits, litigation strategies, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, licensing strategies and information; and (iv) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect COMPANY's business.

6.2. Exclusions. Confidential Information does not include any information that: (i) was in CONSULTANT's possession or known to CONSULTANT, without an obligation to keep it confidential, before such information was disclosed to CONSULTANT by COMPANY; (ii) is or becomes public knowledge through a source other than CONSULTANT and through no fault of CONSULTANT; (iii) is independently developed by or for CONSULTANT; (iv) is disclosed by COMPANY to others without any restriction on use and disclosure; or (v) is or becomes lawfully available to CONSULTANT from a source other than COMPANY.

6.3. Obligations. (i) CONSULTANT agrees that the Confidential Information is COMPANY's sole and exclusive property. CONSULTANT agrees to hold the COMPANY Confidential Information in confidence for a period of six (6) years from the later of the date of termination of this Agreement, or the date of the last date on which Services were performed. CONSULTANT shall not publish, disclose or otherwise make available, directly or indirectly, the Confidential

Information or any part thereof to any third party or use the Confidential Information for any purpose other than in accordance with this Agreement without COMPANY's prior written consent. CONSULTANT agrees to hold his employees or agents to confidentiality obligations at least as strict as the confidentiality provisions included in this Agreement. CONSULTANT shall take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by his agents or employees in violation of the provisions of this Agreement.

7. **CONSULTANT'S REPRESENTATIONS AND WARRANTIES.** CONSULTANT warrants and represents that:

   7.1. No Infringement. CONSULTANT will not Knowingly (as defined herein) infringe upon any copyright, patent, trade secret or other property right of any third party in the performance of the Services required by this Agreement.

   7.2. Authority. CONSULTANT has the authority to enter into this Agreement and to perform all obligations under this Agreement, including, but not limited to, the grant of rights to the Work Product and all related proprietary rights.

   7.3. No Conflicting Grant. CONSULTANT has not granted any rights or licenses to any Work Product and has not entered into any other agreement that would, to CONSULTANT's Knowledge, conflict with CONSULTANT's obligations under this Agreement.

   7.4. Definition. "Knowledge" and "Knowingly" as used herein shall mean that an individual is actually aware of a particular fact or a particular matter.

8. **TERM AND TERMINATION.**

   8.1. Term of Agreement. This Agreement will become effective on the date indicated in the introductory paragraph of this Agreement, and will remain in effect until terminated as set forth in Section 8.2 (Termination of Agreement) below.

   8.2. Termination of Agreement.

      8.2.1. Termination. Each party has the right to terminate this Agreement at any time, upon written notice to the other party.

   8.3. Return of Materials. Upon termination of this Agreement, each party shall promptly return to the other all data, materials and other property of the other held by it. The termination of this Agreement shall not relieve COMPANY of its obligations under Sections 3.1 and 3.2 to pay CONSULTANT for Services performed and to reimburse CONSULTANT for expenses incurred prior to the date of Termination of Agreement.

   8.4. Survival. The following provisions shall survive any termination of this Agreement: Section 5 (Proprietary Rights), Section 6 (Confidential Information), Section 7 (Representations and Warranties), Section 8 (Termination), and Section 9 (Miscellaneous).

9. **MISCELLANEOUS.**

9.1. Entire Agreement. This Agreement is the sole and entire Agreement between the parties relating to the subject matter hereof, and supersedes all prior understandings, agreements and documentation relating to such subject matter.

9.2. Modifications. Any modifications to this Agreement must be in writing and signed by both parties.

9.3. Severability. If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions will continue in full force without being impaired or invalidated in any way.

9.4. Governing Law. This Agreement will be governed by the laws of the State of Texas. The parties hereby submit to the jurisdiction of, and waive any venue objections against, any State or Federal Court located in Texas in any litigation arising out of the Agreement.

9.5. Equitable Relief. CONSULTANT acknowledges that the unauthorized use or disclosure of the Work Product or the Confidential Information will cause irreparable harm and significant commercial damages to COMPANY, the extent of which will be impossible to measure in money. Therefore, if COMPANY should institute any action or bring any proceeding under this Agreement, COMPANY may seek injunctive relief in any court of competent jurisdiction for the breach or threatened breach of Section 6.

· 9.6. No Agency. This Agreement does not create any agency or partnership relationship.

9.7. Assignability. This Agreement is not assignable by CONSULTANT without the prior written consent of COMPANY, but COMPANY may assign its rights under this Agreement to any successor in interest, assignee or licensee.

9.8. This Section is intentionally left blank.

9.9. Indemnification. COMPANY shall indemnify, defend, and hold harmless CONSULTANT from and against all claims, damages, costs, expenses, and reasonable attorneys' fees arising out of a claim by a third party engaged in or threatened with litigation with COMPANY or a third party that has entered into negotiations, a license, covenant not to sue, settlement agreement, or another agreement or relationship with COMPANY, or a third party claiming ownership of Work Product, against CONSULTANT in connection with the Services performed under this Agreement, the litigation identified in Section 2 herein, or COMPANY's use, adaptation, reproduction, distribution, broadcast, or display of the Work Product or of any derivative work of the Work Product. CONSULTANT agrees to notify COMPANY of any such claim promptly in writing and to allow COMPANY to control the proceedings. CONSULTANT agrees to cooperate fully with COMPANY during such proceedings. COMPANY shall defend and settle at its sole expense all proceedings arising out of the foregoing. Notwithstanding any of the foregoing, in the event CONSULTANT has engaged in fraud, gross negligence, or willful misconduct, COMPANY shall have no obligation to indemnify CONSULTANT for any judgments, liability, loss, damages, costs and expenses (including reasonable attorneys' fees and expenses of litigation) in connection therewith.

In Witness Whereof, the parties have caused this Agreement to be executed by their respective duly authorized representative.

CONSULTANT

By: _David N. Lambeth_ (signature)

Print Name: David N. Lambeth

Title: _Owner, Sole proprietor_

Date: _JAN 11, 2011_

PHONE NO.: 412-784-1126

COMPANY

By: _____

Print Name: _____

Title: _____

Date: _____

## SCHEDULE A

## DESCRIPTION OF SERVICES

From time to time and upon request by COMPANY or an authorized COMPANY representative, CONSULTANT shall perform research, analysis or other Services related to magnetics and magnetic thin films.

CONSULTANT shall not exceed forty (40) hours of Services per any one request for Services unless COMPANY provides prior approval to exceed this limitation, which shall not be unreasonably withheld or delayed.

The Services have been requested by Phillip Mitchell.

## SCHEDULE B

## PAYMENT SCHEDULE

COMPANY will pay CONSULTANT as follows:

COMPANY will pay CONSULTANT an hourly rate of Three Hundred U.S. Dollars (USD $300.00) per hour for time spent by CONSULTANT requested by COMPANY or an authorized COMPANY· representative.

In addition, COMPANY shall reimburse CONSULTANT for pre-approved out-of-pocket expenses including equipment rental costs, and supplies used in performing the Services.

CONSULTANT shall keep track of his hours and shall invoice COMPANY on a monthly basis. CONSULTANT shall also include on the invoice the (i) name of the project; (ii) the Services performed and (iii) the name of the COMPANY representative requesting the Services.

A properly completed W-9 shall be furnished to COMPANY by CONSULTANT before any payments can be made for Services.

# EXHIBIT C



**Contacts:** Rob Stewart
Investor Relations
Tel (949) 480-8300
Fax (949) 480-8301

**Media Contact:** Adam Handelsman
Managing Director
Lippert/Heilshorn&Associates
(212)201-6622
ahandelsman@lhai.com

FOR RELEASE
March 7, 2011

## ACCESS CO. AND ACACIA SUBSIDIARY LICENSE SMARTPHONE

### TECHNOLOGY TO SAMSUNG

Tokyo, Japan, and Newport Beach, CA. – (BUSINESS WIRE) March 7, 2011 – Access Co. and Smartphone Technologies LLC, a subsidiary of Acacia Research Corporation (Nasdaq: ACTG), announced today that they licensed to Samsung a portfolio of patents related to smartphones. The patents cover inventions created by Access Co., Palm, Palmsource, Bell Communications Research, and Geoworks.

### ABOUT ACCESS

ACCESS CO., LTD. is a global company providing leading technology, software products and platforms for Web browsing, mobile phones, wireless handhelds, digital TVs and other networked devices. ACCESS' product portfolio, including its NetFront™ Browser, ACCESS Linux Platform™ and Garnet™ OS, provides customers with solutions that enable faster time to market, flexibility and customizability. The company, headquartered in Tokyo, Japan, operates subsidiaries and affiliates in Asia, Europe and the United States. ACCESS is listed on the Tokyo Stock Exchange Mother's Index under the number 4813. For more information about ACCESS, please visit www.access-company.com.

## ABOUT ACACIA RESEARCH CORPORATION

Acacia Research Corporation's subsidiaries partner with inventors and patent owners, license the patents to corporate users, and share the revenue. Acacia Research Corporation's subsidiaries control over 170 patent portfolios, covering technologies used in a wide variety of industries.

Information about Acacia Research Corporation and its subsidiaries is available at www.acaciaresearchgroup.com and www.acaciaresearch.com.

### Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995

*This news release may contain forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Such statements are based upon our current expectations and speak only as of the date hereof. Our actual results may differ materially and adversely from those expressed in any forward-looking statements as a result of various factors and uncertainties, including the recent economic*

*slowdown affecting technology companies, our ability to successfully develop products, rapid technological change in our markets, changes in demand for our future products, legislative, regulatory and competitive developments and general economic conditions. Our Annual Report on Form 10-K, recent and forthcoming Quarterly Reports on Form 10-Q, recent Current Reports on Forms 8-K and 8-K/A, and other SEC filings discuss some of the important risk factors that may affect our business, results of operations and financial condition. We undertake no obligation to revise or update publicly any forward-looking statements for any reason.*

# EXHIBIT D

K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613

T 412.355.6500      www.klgates.com

Patrick J. McElhinny
D 412.355.6334
F 412.355.6501
patrick.mcelhinny@klgates.com

September 27, 2011

<u>VIA FEDEX</u>
SBS Magnetics LLC
6136 Frisco Square Boulevard
Suite 385
Frisco, Texas  75034

> **Re:   Agreement between Lambeth Systems and SBS Magnetics LLC
> dated December 18, 2010**

To Whom It May Concern:

    I am writing on behalf of Lambeth Systems in connection with the Agreement between Lambeth Systems and SBS Magnetics LLC ("SBS") dated December 18, 2010 (the "Agreement").  As you know, SBS has advised Lambeth Systems of its March 4, 2011 settlement with Samsung, which includes a license to the patents and patent applications that are the subject of the Agreement (the "Lambeth Patents"), as well as licenses to other patents unrelated to Lambeth Systems and the Agreement.

    As we have set forth in my letters and emails dated March 10, May 20 and August 24, 2011, and have discussed with, among others, Edward Treska, SBS is in default under the Agreement as follows:

- Breached Section 3.4 by including the Lambeth Patents on the Samsung transaction;

- Undervalued the Lambeth Patents and therefore underpaid Lambeth for his rightful share of the proceeds of the Samsung transaction (Section 2.7);

- Improperly withheld from payments to Lambeth Korean taxes owed by Acacia/SBS in the amount of $173,250 (Sections 2.6 and 2.7); and

PI-3256508 v2

**K&L|GATES**

- Refused to provide all of the pertinent documentation relating to the foregoing (Section 2.7 and 4.2).

The purpose of this correspondence is to provide, in an abundance of caution, SBS with formal notice of the foregoing defaults.

Without waiving any of its rights under the Agreement, Lambeth Systems requests that the mediation contemplated by Section 7.4 of the Agreement take place on a mutually convenient date in Pittsburgh, Pennsylvania within the month of October.

Sincerely,

Patrick J. McElhinny

PJM/ml

cc: Edward Treska (via electronic mail)
    Richard B. Specter (via electronic mail)